PENNSYLVANIA WATER & POWER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56720. Promulgated August 24, 1937.

*Edwin M. Sturtevant, Esq.,* and *Clyde T. Warren, Esq.,* for the petitioner.

*William E. Davis, Esq.,* for the respondent.

MELLOTT: The Commissioner disallowed several hundred thousand dollars, claimed by petitioner as deductions from its gross income in its return for the year 1928, and determined a deficiency in income tax against it for said year in the amount of $86,508.25. He concedes that he erred in disallowing $399,900.10 but contends that a deficiency of $39,675.82 exists by reason of the fact that $337,659.52 of the amount deducted by petitioner was improperly deducted and should be included in its taxable income. All of the facts were stipulated. We set out herein the portion of the stipulation especially pertinent to the issues raised.

1. Prior to 1924, petitioner generated all electricity sold by it exclusively by water power at its hydroelectric plant located on the Susquehanna River at Holtwood, Pennsylvania. The amount of electrical energy generated at Petitioner's hydroelectric plant varied from time to time due to changing river conditions. When the flow of the water in the Susquehanna River was high a maximum amount of electrical energy could be generated, and when the water was low, or ice had accumulated at the dam, the output of the plant was materially reduced. In order to supply Petitioner's customers with adequate and continuous service, and utilize the river flow to the best advantage, it became necessary to provide an auxiliary supply of electrical energy generated by steam.

2. Petitioner was advised by its counsel that it had no corporate powers to engage in the business of generating electricity by steam, and that it would be necessary to incorporate a subsidiary to carry on this activity. Accordingly, on August 9, 1924, Holtwood Power Company, hereinafter referred to as the "Holtwood Company," was incorporated under the laws of the Commonwealth of Pennsylvania, with an authorized capital of $1,500,000 consisting of 15,000 shares of the par value of $100 each. All of these shares were purchased by Petitioner and 50 of the shares were placed in the names of seven directors in order to qualify them as directors, Petitioner, however, remaining the equitable owner of the said 50 shares. With the funds paid by Petitioner to the Holtwood Company for the capital stock, and the proceeds received from the sale of the bonds hereinafter mentioned, Holtwood Company erected the auxiliary steam generating plant on a site immediately adjacent to Petitioner's hydroelectric plant.

3. By an agreement between Petitioner and the Holtwood Company, dated August 26, 1924, a copy of which is attached hereto as "Exhibit No. 1," which agreement ran to January 1, 1975, Holtwood Company agreed to deliver to Petitioner, on its order, electric power up to the full capacity of the steam generating plant, and Petitioner agreed to pay, or provide for the payment, monthly of every obligation and expense of the Holtwood Company, and a net return of 8% annually upon the par value of all its securities at any time outstanding. Among the items enumerated in the agreement to be paid by Petitioner were (1) "a sum to provide for amortization of debt, discount and security issue expense," and (2) "the expenses attending the issue, registration and transfer of the capital stock and bonds * * * now or hereafter issued and outstanding, and all interest on its bonded or other indebtedness at any time outstanding or existing, as and when said several interest payments may become due and payable."

From the date of completion of the Holtwood Company's steam plant on August 16, 1925, to the date of the consummation of the "short form of merger," hereinafter mentioned, of the Holtwood Company into Petitioner (December 21, 1927), all the electric energy generated at the steam plant was delivered to Petitioner. Petitioner's officers were officers of the Holtwood Company, and the Holtwood Company, during its entire existence, was managed and the steam plant operated by Petitioner's officers and employees. The officers of the Holtwood Company did not receive any salaries from that Company and the said Company did not have any employees. Petitioner, however, increased the number of its employees in order to operate the steam plant. The steam plant of the Holtwood Company was operated only at such times as conditions of river flow made it necessary for Petitioner to utilize an auxiliary supply of electric energy. It was operated at all times as a department of Petitioner.

4. For the purpose of providing part of the funds for the construction of the steam power plant, Holtwood Company executed a mortgage and deed of trust to the New York Trust Company, Trustee, dated September 1, 1924, whereby it conveyed all its property to the said trustee for the purpose of securing bonds to be issued under said deed of trust not in excess of $25,000,000 at any one time outstanding. A copy of the said deed of trust is filed herewith, marked "Exhibit No. 2." The deed of trust (page 15) provided that the bonds might be issued in one or more series; that a series of bonds limited to $2,750,000 in aggregate principal amount should be designated "Series A" (page 16); that Series A bonds should be dated September 1, 1924 (page 17), should bear interest at the rate of six per centum (6%) per annum (page 16), should mature September 1, 1954 (page 16), and should be redeemable at the option of the Holtwood Company, as a whole or in any part, on any interest date prior to maturity at the principal amount thereof, together with a premium of seven per centum (7%) of the principal amount thereof in the case of bonds redeemed on or before September 1, 1929 (page 17), which premium was to be reduced one-fourth of one per cent, on March 1, 1930, and on the first day of March in each year thereafter until March 1, 1953, when the redemption price would be 101 per cent. (page 17).

5. Subsequent to the execution of the said deed of trust, the Holtwood Company sold to the public $2,750,000 par value of its Series A 6% First Mortgage Sinking Fund Gold Bonds, dated September 1, 1924, maturing September 1, 1954, and received therefor a cash consideration of $2,612,500.

6. The issuance of the Holtwood Bonds comprehended a financing cost of $162,749.87 represented by discount and expenses as follows:

| | |
|---|---|
| Discount | $137,500.00 |
| Expenses | 25,249.87 |
| Total | $162,749.87 |

7. This amount of $162,749.87 was set up on the books of the Holtwood Company as "Unamortized Bond Discount and Expense." Each year from 1924 to 1927, inclusive, the discount and expense was amortized on the books of the Holtwood Company by charging off an aliquot portion of the said discount and expense based on the life of the bonds.

8. The Holtwood Company had no income other than payments made to it by Petitioner pursuant to the agreement dated August 26, 1924, above referred to and filed herewith as "Exhibit No. 1."

9. Each year from 1924 to 1927, inclusive, a consolidated income tax return was filed for Petitioner and the Holtwood Company. In the said income tax returns the discount and expense, applicable to the Holtwood Bonds, was

pro-rated or amortized by taking as deductions in each of said years an aliquot portion of the said discount and expense based on the life of the bonds.

The Petitioner was required by the agreement of August 26, 1924, to make payments to the Holtwood Company on account of the amortization of bond discount and expense, which payments were deductible from Petitioner's gross income as ordinary and necessary business expenses (cost of power), and the Holtwood Company reported these payments as income, which were offset by its deductions on account of amortization of discount and expense. The said agreement ran to January 1, 1975 and the Holtwood Bonds matured September 1, 1954.

10. After the incorporation of the Holtwood Company, Petitioner was advised by its counsel that Petitioner and the Holtwood Company could not consolidate or merge because they were not engaged in similar businesses, since Petitioner had power to supply water to the public, which power the Holtwood Company did not possess. On June 26, 1926, the Supreme Court of Pennsylvania, in the case of *York Haven Water and Power Co. et al.* v. *Public Service Commission of Pennsylvania et al.*, 287 Pa. 241, 134 Atl. 419, decided, under similar facts, that such companies might consolidate or merge provided the power to supply water be legally discarded. On October 4, 1927, pursuant to the holding of the Court in that case, Petitioner surrendered its corporate power to store, transport and supply water in accordance with the procedure prescribed by the corporation law of Pennsylvania.

Thereafter a "short form of merger" of the Holtwood Company into Petitioner was effected under Section 23 of the Act of the Commonwealth of Pennsylvania of April 29, 1874, as amended by Section 5 of the Act of April 17, 1876, and the Act of June 2, 1915, a copy of which is filed herewith as "Exhibit No. 3." Pursuant to and in accordance with the procedure prescribed by the said Act, as amended, Holtwood Company, by deed dated December 21, 1927, transferred all its franchises and property, real, personal and mixed to Petitioner, the sole consideration for the transfer being the delivery to the Holtwood Company of all its capital stock, and Petitioner assuming the indebtedness of the Holtwood Company. Thereupon, pursuant to the provisions of the Act of 1874, as amended, Holtwood Company, by operation of law ceased to exist. All the returns and certificates relating to the said "short form of merger," required by the said Act to be filed, were duly filed in the Office of the Secretary of the Commonwealth.

11. In determining the income tax liability of Petitioner and the Holtwood Company for the year 1927, during which year the "short form of merger" of the Holtwood Company into Petitioner was consummated, the said companies and the Respondent treated the said merger as a non-taxable transaction giving rise to no gain or loss.

12. On March 1, 1928, Petitioner sold to the public $6,000,000 par value of its Series B 4½% Bonds, dated March 1, 1928, maturing March 1, 1968.

13. The purpose of the issue of $6,000,000 par value of Petitioner's Series B 4½% Bonds was to apply the proceeds to the retirement of $3,000,000 of Petitioner's Series A 5½% Bonds and $2,750,000 par value of Holtwood Bonds.

14. On March 1, 1928, pursuant to notice dated January 27, 1928 (given by Petitioner as successor to the Holtwood Company) duly published and mailed to holders of the Holtwood Bonds, Petitioner retired for cash the $2,750,000 of Holtwood Bonds, paying therefor par plus a premium of 7%, or $192,500. None of the Holtwood Bonds were exchanged for Petitioner's Series B Bonds.

In retiring the Holtwood Bonds, Petitioner exercised the option, originally reserved to the Holtwood Company in the deed of trust under which the bonds

were issued, to which Petitioner succeeded as a result of the "short form of merger."

15. On January 1, 1928, the year of the retirement of the Holtwood Bonds, the balance of discount and expense applicable to said bonds, which had not been amortized and deducted for income tax purposes, amounted to $145,159.52.

16. In its income tax returns for 1928 Petitioner claimed (among others) the following deductions:

| | |
|---|---|
| Amortized portion of discount and expense applicable to Holtwood Bonds for the period January 1, 1928 to February 28, 1928____ | $904.42 |
| Unamortized discount and expense on Holtwood Bonds_____ | 144,255.10 |
| Premium paid in retirement of Holtwood Bonds_____ | 192,500.00 |
| Total_____ | $337,659.52 |

The question, as stated by both parties upon brief, is—"Is petitioner entitled, as the successor of its wholly owned subsidiary, Holtwood Power Company, to deduct from gross income for the year 1928, (a) the unamortized discount and expense incurred in the issuance, and, (b) premium paid in the retirement of Holtwood Power Company Series A 6% First Mortgage Sinking Fund Gold bonds, dated September 1, 1924, and maturing September 1, 1954, which petitioner retired for cash on March 1, 1928 at par plus premium of 7% by the use of part of the proceeds of Petitioner's Series B. 4½% bonds?" The portion of the question referred to as (a) will be considered first.

Petitioner contends, and it is apparently conceded by respondent, that if the transaction by which the petitioner assumed the bonds of Holtwood Power Company constituted a merger or consolidation, then petitioner is entitled to deduct the unamortized discount and expense of issuing such bonds, which the parties have stipulated to be $144,255.10. This contention is sound and accords with the view frequently expressed by the courts and this Board. *Western Maryland Railway Co.* v. *Commissioner*, 33 Fed. (2d) 695; *New York Central Railroad Co.* v. *Commissioner*, 79 Fed. (2d) 247; *Illinois Power & Light Corporation*, 33 B. T. A. 1189; *Metropolitan Edison Co.*, 35 B. T. A. 1110; *Coast Counties Gas & Electric Co.*, 36 B. T. A. 385. But if the transaction is a mere purchase or sale, the purchasing corporation is not entitled to the deduction. *Turner-Farber-Love Co.* v. *Helvering*, 68 Fed. (2d) 416; *American Gas & Electric Co.* v. *Commissioner*, 85 Fed. (2d) 527, affirming 33 B. T. A. 471; *American Gas & Electric Co.* v. *United States*, 17 Fed. Supp. 151; *Metropolitan Edison Co.*, *supra*. (Issue IV.) It is therefore necessary to determine whether the transaction was a sale, as contended by the respondent, or a merger, as contended by the petitioner.

The instant proceeding is not distinguishable upon its facts from those in *Metropolitan Edison Co.*, *supra*, bearing upon issue .V. There, as here, there was so-called "short form merger" under the

identical section of the Pennsylvania law now under consideration. The section reads as follows:

Any corporation created under the provisions of this act, * * * may reduce its capital stock * * * by a vote of the stockholders * * *; and it shall be lawful for any corporation in the same manner to sell, assign, dispose of and convey to any corporation created under or accepting the provisions of this act, it franchises, and all its property, real, personal and mixed, and thereafter such corporation shall cease to exist, and the said property and franchises not inconsistent with this act, shall thereafter be vested in the corporation so purchasing as aforesaid * * *.

We said, in passing upon the issue in that case, that the "so-called merger * * * amounted in effect to a sale by the subsidiary of its assets to the parent corporation." We have reexamined the question in the light of the authorities cited by petitioner in its able brief but are not persuaded that we were wrong in the *Metropolitan Edison* case or that a different conclusion should be reached under the stipulated facts in this case. However, in view of the fact that our decision in the *Metropolitan Edison* case was promulgated subsequent to the filing of the briefs in the instant case, it will not be amiss to discuss some of the cases cited by petitioner.

Petitioner contends that the "short form merger" meets all the essential legal requirements of a merger, as defined by the Circuit Court of Appeals for the Second Circuit in *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937, certiorari denied, 288 U. S. 599, including the requirement added in *American Gas & Electric Co.*, *supra*. It relies especially upon, the portion of the opinion in the *Cortland Specialty* case in which the court says that "A merger ordinarily is an absorption by one corporation of the properties and franchises of another whose stock it has acquired. The merged corporation ceases to exist and the merging corporations alone survives." While the definition was never intended to embrace all situations which might arise, the court advisedly using the word "ordinarily" and referring later in its opinion to the fact that the statutes of the states vary "in respect to how far the constitutent companies may be deemed to survive the creation of the new or modified corporate structure", we are nevertheless constrained to hold that petitioner has not shown itself to be within that definition.

Petitioner contends that the opinion of the Supreme Court of Pennsylvania in *Merwine* v. *Mt. Pocono Light & Improvement Co.*, 304 Pa. 517; 156 Atl. 150, "is a definite holding that a transfer by a corporation, under the procedure prescribed by the Act of 1876, as amended (shown *supra*), of its franchises and property to a corporation with which it is affiliated, under circumstances similar to those of the case at bar, is merely a formality and the transaction

in reality is a merger of the two companies." While the court did say—though perhaps it was *obiter dictum* in view of the fact that it was not required to make any such determination—"that the transaction between the two corporations was in reality a merger," in the very next sentence it referred to the transferee corporation as "a purchaser cum onere" and instructed the personal injury plaintiff, in the event of judgment against the transferor corporation, "to levy where defendant's [transferor corporation] assets liable for the judgment may be found." It also held specifically that the transferor corporation had not "ceased to exist"—an essential under the definition petitioner is relying upon—saying:

> The statute of 1874 and its amendments plainly reveal that the words "shall cease to exist primarily refer to a cessation of carrying on the business for which the selling corporation was created. * * * Defendant corporation [selling corporation] not having been legally dissolved, its present condition is rather that of an inactive corporation and it is not altogether dead. Before a corporation has ceased to exist in the absolute sense here contended for, it must fully and definitely close its affairs, and the fact that a corporation has "ceased to do business" does not preclude it from exercising its various rights to accomplish this purpose. * * *

The above holding accords with the views of the same court as expressed in *Commonwealth* v. *Lumber City Water Co.*, 225 Pa. 317; 74 Atl. 238.

Petitioner also relies upon *York Haven Water & Power Co.* v. *Public Service Commission of Pennsylvania*, 287 Pa. 241; 134 Atl. 419. That case involved the question of the right of an electric light, heat, and power company to purchase or merge with a hydroelectric or water power company. The court in its opinion said:

> There are two forms of consolidation in Pennsylvania, a short and a long form merger. These are accomplished by the act of 1876, as amended, and the act of 1909. The act of April 17, 1876 (P. L. 33 [30]), as amended, provides that such sale may take place if the "franchises are not inconsistent" with this act. And the Merger Act 1909 (P. L. 408; Pa. St. 1920, § 5748 et seq.) permits consolidation between corporations "transacting the same or similar lines of business."

In a later decision, *In re Buist's Estate*, 297 Pa. 537; 147 Atl. 606, the court, considering and discussing whether the merger of a number of banking institutions into the Philadelphia National Bank under the act of Congress (November 7, 1918, ch. 209, § 1, 40 Stat. 1043, U. S. C. A., title 12, § 33), empowering national banks to consolidate, constituted a sale, liquidation, or a merger or consolidation of assets, stated as follows:

> * * * Care should be taken to distinguish consolidation from proceedings under the Act of April 17, 1876, P. L. 33 [30], § 5, as amended (Pa. St. 1920, § 5694), often referred to as a "short form merger" (See *York Haven W. & P.*

*Co.* v. *P. S. C.*, 287 Pa. 241, 134 A. 419) ; its operation in reality effects a sale of all the company's assets.

The new conception was not on the basis of sale, but of a merger or consolidation of assets, which is opposed to sale.

In a number of cases the Pennsylvania courts have referred to transactions under the act in question as being sales. See *Koehler* v. *St. Mary's Brewing Co.*, 228 Pa. 628; 77 Atl. 1016; *Greensburg Borough* v. *Westmoreland Water Co.*, 240 Pa. 481; 87 Atl. 995; *Ringler* v. *Atlas Portland Cement Co.*, 301 Pa. 176; 151 Atl. 815. Thus in the last case cited, *supra*, the court refers to the act as regulating "the sale of franchises and assets of one Pennsylvania corporation to another, involving the dissolution of the selling corporation", while in a very recent case, *In re Daily's Estate*, 186 Atl. 754 (1936), the court, citing with approval the *Buist Estate* case, *supra*, holds that "a merger is not a sale or liquidation of corporate property but a consolidation of property, powers and facilities."

It will be noted that the act authorizes a corporation "to sell, assign, dispose of and convey" its property. The stipulation shows that that is what occurred here. Holtwood, by deed, transferred all its franchises and property to petitioner, the sole consideration being the delivery to it of its capital stock and the assumption of its indebtedness. "The transaction certainly bore all the characteristics of a simple sale" (*Cortland Specialty Co.* v. *Commissioner, supra*), and we are still of the opinion, which we expressed in *Metropolitan Edison Co., supra*, that the so-called "short form merger" was, in effect, simply a sale by Holtwood of its assets to this petitioner. It follows that the respondent did not err in disallowing, as a deduction from petitioner's gross income, the unamortized discount and expense on the Holtwood bonds in the amount of $144,255.10.

Petitioner must prevail in so far as subdivision (b) of the question is concerned, though not upon the grounds urged in its brief. It is now settled that premiums paid by a parent corporation in the retirement of bonds issued by its subsidiary and assumed by it in a transfer of the assets of the subsidiary to it, are deductible from the gross income of the parent corporation, though a contrary view at one time prevailed. The question was recently considered by this Board in *Metropolitan Edison Co., supra* (issue III). Therein we reviewed the court and Board decisions and concluded that the reasoning under which a conclusion had been reached that such expenditures were not deductible was unsound and should no longer be followed. We pointed out that, while we thought they were deductible as ordinary and necessary expenses of carrying on a trade or business (section 23 (a), Revenue Act of 1928), if they were not properly so classified they were nevertheless deductible as losses

(section 23 (e), Revenue Act of 1928). Such was the holding of the Court of Claims in *American Gas & Electric Co.* v. *United States*, 17 Fed. Supp. 151, which we thought and still think to be sound. The portion of our opinion in *Coast Counties Gas & Electric Co.*, 33 B. T. A. 1199, holding that such premiums were not deductible, has now been set aside. (*Coast Counties Gas & Electric Co.*, 36 B. T. A. 385. The facts before us in the instant proceeding clearly require that we reach, and we do reach, the same conclusion here.

It is therefore held that the respondent erred in disallowing the deduction from petitioner's gross income of the premium paid by it in retirement of the Holtwood Power Co. bonds, amounting to $192,500.

Deficiency shall be recomputed in accordance with the views herein expressed.

*Judgment will be entered under Rule 50.*